IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| EMS TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, et al.,<br><br>Defendants. | Civil Action No. 2:10-cv-00032-DF<br><br>Jury Trial Demanded |

**DEFENDANT GENERAL ELECTRIC COMPANY'S
ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT AND COUNTERCLAIMS**

Defendant General Electric Company ("GE") files this Answer to Plaintiff's First Amended Complaint for Patent Infringement (Dkt. #126) and Counterclaims based upon actual knowledge as to itself and its own actions and upon information and belief as to all other persons and events:

**ANSWER**

**Parties**

1. GE is currently without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint.

2. Admitted.

3. GE is currently without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 3 through 14 of the Complaint.

**Jurisdiction and Venue**

4.  Admitted that the Complaint purports to set forth a claim for patent infringement and this Court has subject matter jurisdiction. GE denies the remaining allegations of paragraph 15 of the Complaint.

5.  Admitted that venue is proper in this District. GE denies the remaining allegations of paragraph 16 of the Complaint.

6.  Admitted that GE conducts business in this District. GE denies the remaining allegations of paragraph 17 of the Complaint.

**Count I**
**Infringement of U.S. Patent No. 6,169,979**

7.  Admitted that U.S. Patent No. 6,169,979 (the "'979 patent") is entitled "Computer-Assisted Sales System for Utilities"; it issued on January 2, 2001; and Exhibit A purports to be a copy of the '979 patent. GE denies the remaining allegations of paragraph 18 of the Complaint.

8.  GE denies the allegations of paragraph 19 of the Complaint.

9.  GE is currently without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 20-31 of the Complaint.

**Plaintiff's Prayer for Relief**

10.  GE denies that plaintiff is entitled to any relief requested in its prayer.

**Plaintiff's Jury Demand**

11.  GE denies that plaintiff has any valid or cognizable claim or cause of action for patent infringement, that infringement occurred, and that plaintiff has claims triable by jury.

### Affirmative Defenses

12. GE asserts the following affirmative defenses to the Complaint. GE reserves its right to assert additional affirmative defenses that may now exist or in the future be available based on discovery and further investigation in this case, including those under Fed. R. Civ. P. 8(c), the patent laws, and any other defenses at law or in equity.

### Patent Invalidity

13. One or more claims of the '979 patent is invalid for failing to meet one or more of the requisite requirements for patentability under Title 35 of the United States Code, including §§ 101, 102, 103, 112, 116, 118, 119, or 256.

### Non-Infringement

14. GE has not infringed, actively induced infringement, or contributorily infringed, and is not infringing, any valid claim of the '979 patent, and no valid claim of the '979 patent can be properly construed to cover the manufacture, use, sale, importation, or offer for sale of any GE product or service.

### Prosecution History Estoppel

15. Plaintiff's alleged cause of action for patent infringement is barred under the doctrine of prosecution history estoppel, and plaintiff is estopped from claiming that the '979 patent covers or includes any accused GE product or service.

### Unenforceability

16. The claims of the '979 patent are unenforceable.

### Laches

17. Plaintiff's claims are barred by laches, resulting from plaintiff's unreasonable and inexcusable delay in bringing suit, which delay has materially prejudiced GE.

### Waiver and Acquiescence

18. The '979 patent is unenforceable against GE because of waiver and/or acquiescence.

### Failure to Mark

19. Plaintiff's claim for damages is limited by the marking and notice provisions of 35 U.S.C. § 287.

### COUNTERCLAIMS

20. Based upon actual knowledge as to itself and its own actions, and upon information and belief as to all other persons and events, defendant/counterclaim-plaintiff GE alleges for the following counterclaims against plaintiff/counterclaim defendant:

21. GE is a New York corporation with its principal place of business in Connecticut.

22. Plaintiff is a Texas limited liability company having a principal place of business in Texas.

### Jurisdiction and Venue

23. This Court has subject matter jurisdiction over these counterclaims by virtue of 28 U.S.C. §§ 1331, 1338(a), 1367, 2201, and 2202. Personal jurisdiction and venue are proper here.

### Count One
### (Declaratory Judgment of Non-Infringement)

24. GE realleges its preceding material fact allegations as if fully set forth here.

25. Plaintiff purports to own the '979 patent.

26. On January 26, 2010, plaintiff filed a Complaint in this Court seeking to enforce the '979 patent against GE, alleging that GE "has been, and now is directly infringing,

and indirectly infringing by way of inducing infringement, jointly infringing and/or contributing to the infringement of the '979 patent in the State of Texas, in this judicial district, and elsewhere in the United States."

27.     An actual controversy exists between GE and plaintiff with respect to the infringement, validity, and enforceability of the '979 patent.

28.     GE does not now and has never infringed, actively induced infringement, or contributorily infringed any valid claim of the '979 patent, and no valid claim of the '979 patent can be properly construed to cover the manufacture, use, sale, importation, or offer for sale of any GE product or service.  GE is entitled to a declaratory judgment to that effect.

29.     GE seeks a declaration that GE does not directly infringe, contributorily infringe, or induce infringement of any claim of the '979 patent, either literally or under the doctrine of equivalents.

30.     Alternatively, GE seeks a declaration that any alleged infringement by GE would not be actionable by plaintiff by virtue of one or more of GE's Affirmative Defenses.

**Count Two**
**(Declaratory Judgment of Invalidity)**

31.     GE realleges the preceding material fact allegations as if fully set forth here.

32.     Plaintiff's filing of the Complaint is an assertion that the claims of the '979 patent are valid, which GE denies.  Thus, a real and immediate justiciable controversy exists between the parties.

33.     One or more claims of the '979 patent are invalid for failure to meet one or more of the requisite requirements for patentability under Title 35 of the United States Code, including §§ 101, 102, 103, 112, and 116.  GE is entitled to a declaratory judgment as to the invalidity of the '979 patent.

## Count Three
### (Declaratory Judgment of Unenforceability)

34.     GE realleges the preceding material fact allegations as if fully set forth here.

35.     Plaintiff's filing of the Complaint is an assertion that the claims of the '979 patent are valid and enforceable, which GE denies.  Thus, a real and immediate justiciable controversy exists between the parties.

36.     The '979 patent is unenforceable in view of, among other things, the failure of inventor Jerome Johnson (and others who owed the Patent Office a duty of candor) to disclose Clear With Computers' ("CWC") prior sale to its customer, Northern States Power ("NSP"), of a computer program named EnergyWorks that was material prior art to the claims of the '979 patent.  Jerome Johnson was the founder and president of CWC, and was substantially involved in the EnergyWorks transaction.  This omission was material to the patentability of the claims of the '979 patent, and made with the intent to deceive the Patent Office into allowing the claims of the '979 patent.

### 1.   The '979 Patent's Earliest Possible Critical Date:  August 15, 1993.

37.     The '979 patent claims priority from its parent, U.S. Patent No. 5,758,331, which has an earliest possible filing date of August 15, 1994.

38.     As such, the '979 patent's earliest possible critical date is August 15, 1993.

### 2.   The June 1992 Memorandum of Understanding Between CWC and NSP

39.     In June 1992, Clear With Computers and Northern States Power entered into a Memorandum of Understanding ("MOU").

40.     The MOU provided that CWC would "design a prototype of a computer electronic sales and training system."

41. The MOU further provided that CWC would "create and deliver to NSP a design and partial prototype of a computerized sales tool."

42. The MOU further provided that by July 15, 1992, CWC was to deliver to NSP a partial working prototype that was to be "substantially similar to the final system," "samples of outputs and screens to be generated by the System," "the functional requirements for the System," and a "detailed statement of work including milestones and time tables."

43. The MOU further provided that CWC's fee for the "study phase" of the system was to be $80,000.

44. Jerome D. Johnson, the inventor of the '979 patent and president and founder of CWC, executed the MOU on June 17, 1992 on behalf of CWC.

45. On July 8, 1992 NSP issued purchase order ED6525MB to CWC in the amount of $80,000, to "develop software packages for NSP."

46. On July 14, 1992 CWC Project Coordinator Lisa Jaeger wrote to NSP to confirm CWC's receipt of the purchase order.

### 3. The January 18, 1993 Software Use and General Services Agreement

47. On January 18, 1993 CWC and NSP executed a Software Use and General Services Agreement ("SUGSA").

48. The SUGSA evidences that CWC provided the "functional requirements" document described above on January 15, 1993.

49. The SUGSA provided that NSP would pay CWC $587,000 for an "approved adaptation" of CWC's software to NSP's Minnesota electric group.

50. The SUGSA further provided that NSP would pay CWC an amount "not to exceed $35,000" for an interface with NSP's sales and account management system.

51. The SUGSA further set for a schedule for the $587,000 to be paid to CWC between August 1992 and August 1993.

52. The SUGSA identified several modules to be included in the software CWC was providing: "customer information," "NSP programs and services," "recommendations" and "proposals," among others.

53. The SUGSA further indicated that CWC's software would provide "Graphics for Programs and Services" and "recommendations."

54. The SUGSA further indicated that CWC's software would provide "Data Entry, including rates, tables, programs and services."

55. The SUGSA was executed on January 18, 1993 by CWC's Senior Vice President E.R. Cummings, and on January 27, 1993 by R.H. Schulte, NSP's VP of Customer Service.

56. The software provided by CWC under the SUGSA was named "EnergyWorks."

57. An EnergyWorks training proposal issued by CWC on August 5, 1993 explicitly references the "Software Use and General Services Agreement dated January 18, 1993 regarding software developed by CWC for NSP (hereinafter, EnergyWorks)."

### 4. Programming and Further Enhancements to EnergyWorks

58. CWC employees Samuel Clark, Loren Halvorson and Jane Huang, among others, created the computer code for EnergyWorks.

59. Jerome Johnson was substantially involved in the development of EnergyWorks, and CWC's offers for sale and sale of EnergyWorks to NSP. Jerome Johnson attended several meetings to review the look and feel of the user interfaces, and repeatedly

encouraged the programmers to make the EnergyWorks system as user-friendly as possible. This was consistent with Mr. Johnson's aim of making things "clear with computers" for their users—in this case, NSP.

60. On July 26, 1993, CWC issued a written proposal to further enhance EnergyWorks to interface with NSP's MKS sales and marketing system. The proposal states that "NSP and CWC are working together to develop, maintain and support an electronic sales system, EnergyWorks, used by NSP representatives to present product information and to prepare quotes and proposals for potential customers."

61. The proposal further noted that "NSP has requested that EnergyWorks be enhanced to pull customer information from a file created by the NSP MKS system."

62. Consistent with the cost limitations (not to exceed $35,000) imposed by the January 18, 1993 SUGSA, the enhancement was priced at $8,800.

63. NSP accepted the proposal on August 4, 1993. It issued a change memorandum for the $8,800. The change memorandum indicated that the maximum P.O. amount was thereby increased to $595,800.

64. NSP received and installed EnergyWorks on various computers within NSP in 1993.

65. NSP used a version of EnergyWorks it received from CWC before August 15, 1993.

### 5. Inventor Jerome Johnson Never Disclosed EnergyWorks to the PTO

66. As discussed above, EnergyWorks was prior art to the claims of the '979 patent.

67. EnergyWorks was offered for sale as early as June 1992, via the MOU.

68. EnergyWorks also was offered for sale on January 18, 1993, via the SUGSA.

69. EnergyWorks was in public use before August 15, 1993, on NSP computers.

70. EnergyWorks embodies the subject matter of the claims of the '979 patent.

71. The '979 patent is titled "Computer-Assisted Sales System for Utilities." EnergyWorks was a computer-assisted sales system for a utility, Northern States Power.

72. The '979 patent itself states, at 3:65 – 4:1: "FIGS. 2 and 3 illustrate a preferred structure for modules of software executed by the system. The system 18, including the software processing, is also referred to in the present specification as 'utilities system' (ENERGYWORKS)."

73. The phrase "utilities system," which is used pervasively throughout the '979 patent, was chosen as a replacement for "EnergyWorks" to disguise the fact that the claimed invention was already the subject of a prior offer for sale and was already in prior public use before the '979 patent's critical date.

74. Though the '979 patent explains the invention predominantly with reference to "utilities system," references to EnergyWorks file types and subdirectories can be detected at 8:23-25, 9:14-15, and 20:21-24.

75. The appendices to the '979 patent, which are less publicly accessible than the specification and claims, pervasively reference NSP and EnergyWorks. Namely:

   a. Appendix A, containing a "sample typical proposal" references NSP as the utility on pages 2, 9-10 and 12;

   b. Appendix B, containing a "sample proposal with all reports from an exemplary collection of reports" references NSP as the utility on pages 14, 86-88, 90-99, 102, 106-107, 109-110, 113, 115-116, 118-119, 122, 125-127;

   c. Appendix B also includes a reference to "Saver's Switch," an NSP tradename, on pages 33 and 45;

  d.  Appendix D, containing "source code for miscellaneous calculations," provides a program named "NSPForm" written in the language "C++" by CWC employees Sam Clark, Jane Huang and others that performs calculations according to numerous "NSPFormula[e]," i.e., "NSP Formulae";

  e.  Appendix E, containing "main screen user interfaces for the system" references NSP as the utility and NSP customers (including hospital Immanuel St. Josephs and others), on pages 217-219, 223, 232, 240-241, 243, 247-248. Some of these screen user interfaces also display the name "EnergyWorks";

  f.  Appendix E also shows (on page 220) a sample file directory in which "MKS files (*.mks)" are stored in a "cwc-dir\nsp" subdirectory on a computer. As discussed above, MKS was NSP's marketing and sales system.

    1. Moreover, CWC's July 26, 1993 proposal to integrate EnergyWorks with MKS specified that files would be placed "within the CWC-DIR\NSP directory on the PC."

    2. CWC's July 26, 1993 proposal further specified that "file[s] being extracted from MKS will have .MKS file extension name[s] each time a file is extracted";

  g.  Appendix E also shows (on page 222) a sample file directory in which "EnergyWorks files (*.ew1)" are stored in a "cwc-dir\nsp" subdirectory on a computer;

  h.  Appendix E's page 249 is a screen user interface titled "NSP EnergyWorks online reference. Among the links a user could click on is "Prepare MKS information for use in your presentation," which is another reference to NSP's "MKS" marketing and sales system;

  i.  Appendix G, containing "user interfaces for the rates module" references NSP customer Immanuel St. Josephs on pages 263-266;

  j.  Appendix H, containing "user interfaces for the inventory module" references NSP customer Immanuel St. Josephs on page 286;

  k.  Appendix I, containing "user interfaces for the conservation module," references NSP customer Immanuel St. Josephs on pages 347 and 413-414;

  l.  Appendix J, containing "user interfaces for the finance module," references NSP customer Immanuel St. Josephs on page 416;

    m. Appendix K, containing "user interfaces for the customer module," references NSP customer Immanuel St. Josephs on page 422; and

    n. Appendix L, containing "user interfaces for the proposal module," references NSP customer Immanuel St. Josephs on page 430.

  76. Simply put, the EnergyWorks system offered for sale and sold by Jerome Johnson's company, CWC, to its client NSP, embodies each element of each claim of the '979 patent.

  77. For example, the EnergyWorks system offered for sale and sold to NSP before the '979 patent's critical date collected historical data on the energy usage of NSP's customers.

  78. The EnergyWorks system offered for sale and sold to NSP before the '979 patent's critical date also collected data on utility rates offered by NSP.

  79. The EnergyWorks system offered for sale and sold to NSP before the '979 patent's critical date also collected data on cost savings programs offered by NSP.

  80. The EnergyWorks system offered for sale and sold to NSP before the '979 patent's critical date processed the aforementioned data to select a utility rate and cost saving program for NSP's customer.

  81. The EnergyWorks system offered for sale and sold to NSP before the '979 patent's critical date generated reports and/or proposals to be sent to NSP's customer to show the customer's revised utility costs after applying the selected rate and costs saving program to the customer's utility usage.

  82. However, neither Jerome Johnson nor anyone else with a duty of candor as to the '979 patent ever informed the Patent Office of the prior offers for sale and the prior sale of EnergyWorks to NSP.

83. Mr. Johnson had patented other inventions before the '979 patent, and was well aware of the duty of candor he owed the Patent Office at the time in which he failed to mention the prior offers for sale and sale of EnergyWorks to NSP.

84. Mr. Johnson and others with a duty of candor as to the '979 patent withheld this information from the Patent Office with the intent to deceive the Patent Office into allowing the claims of the '979 patent to issue.

85. GE is entitled to a declaratory judgment as to the unenforceability of the '979 patent.

## Jury Demand

86. GE demands a jury trial on all issues of its Counterclaim that are so triable.

## Prayer for Relief

For these reasons, defendant/counter-claimant GE prays for relief from the Court, after trial or final hearing, as follows:

a. Dismiss the Complaint in its entirety with prejudice and enter judgment for GE that plaintiff recovers nothing;

b. Declare that GE has not and does not infringe, either literally or under the doctrine of equivalents, actively induce infringement of, or contributorily infringe any valid and enforceable claim of the '979 patent;

c. Declare that the '979 patent is invalid;

d. Declare that the '979 patent is unenforceable;

e. Award GE its costs (including expert fees), disbursements, and reasonable attorney fees incurred in this action, pursuant to 35 U.S.C. § 285; and

f. Grant all other relief to GE as is just and proper.

Dated:  November 12, 2010          Respectfully submitted,

                                         /s/ Thomas M. Morrow
                                         T. John Ward, Jr.
                                         (State Bar No. 00794818)
                                         Wesley Hill
                                         (State Bar No. 24032294)
                                         WARD & SMITH LAW FIRM
                                         111 W. Tyler Street
                                         Longview, Texas 75601
                                         Tel.:  (903) 757-6400
                                         Fax:  (903) 757-2323
                                         Email:  jw@jwfirm.com
                                                      wh@jwfirm.com

                                         R. Paul Yetter
                                         (State Bar No. 22154200)
                                         Thomas M. Morrow
                                         (State Bar No. 24039076)
                                         Kevin J. Terrazas
                                         (State Bar No. 24060708)
                                         YETTER COLEMAN, LLP
                                         909 Fannin, Suite 3600
                                         Houston, TX  77010
                                         Tel.:  (713) 632.8070
                                         Fax:  (713) 632.8002
                                         Email:  pyetter@yettercoleman.com
                                                      tmorrow@yettercoleman.com
                                                      kterrazas@yettercoleman.com

                                         COUNSEL FOR DEFENDANT
                                         GENERAL ELECTRIC COMPANY


**Certificate of Service**

       I certify that this pleading was filed electronically with the Court, and thus served simultaneously upon all counsel of record, this 12th day of November, 2010.

                                         /s/ Thomas M. Morrow
                                         Thomas M. Morrow