

T. JOHN WARD, JR.
JW@WSFIRM.COM

April 18, 2011

Hon. Chief Judge David Folsom
U.S. District Court, Eastern District of Texas
500 North State Line Ave, Third Floor
P.O. Box 2090
Texarkana, Texas 75504

      Re:    *EMS Technologies, LLC v. General Electric Co. et al.*, C.A. No. 2:10-cv-0032 in the U.S. District Court for the Eastern District of Texas, Marshall Division

Dear Honorable Chief Judge Folsom:

Defendant General Electric Company respectfully submits this request for permission to file a motion for summary judgment of invalidity of the ten asserted claims of the patent-in-suit, U.S. Patent No. 6,169,979 (the '979 patent), on this ground:

> Before the patent's critical date in 1993, the inventor's company offered for sale and sold the invention recited in the '979 patent claims.

GE also is filing a second request for permission to file a motion for summary judgment based on the prior sale of an accused device, the XA/21™ control system, before the critical date.

## Status and Relevant Background

Plaintiff EMS Technologies, LLC filed this suit against GE and several other defendants on January 26, 2010. GE is the sole remaining defendant in the case. The *Markman* hearing is set for November 3, 2011, with plaintiff's opening *Markman* brief not due until September 12. Jury selection is set for March 6, 2012.

The '979 patent, titled "Computer-Assisted Sales System for Utilities," is directed to a system and method that utility companies could use to help customers select the most cost-effective rate program and electricity conservation program from among those offered by the utility. The patent refers by name to a preferred embodiment of the computer-implemented system: EnergyWorks. *See* '979 patent, at 3:65-4:1: "Figs. 2 and 3 illustrate a preferred structure for modules of software executed by the system. The system 18, including the software processing, is also referred to in the present specification as 'utilities system' (ENERGYWORKS)."

Discovery in this case has uncovered the fact that well before the August 15, 1993 critical date, the original assignee of the patent, Clear With Computers, Inc. (CWC), offered for sale and sold to utility company Northern States Power (NSP), a computer-assisted sales system that met each element of each claim-in-suit. Unsurprisingly, that system was known as EnergyWorks.

P.O. BOX 1231 | LONGVIEW, TEXAS 75606 | T 903.757.6400 | F 903.757.2323 | WWW.WSFIRM.COM

In February 1992, CWC began work on a "computerized sales tool" for NSP. A few months later in June, the parties entered into a Memorandum of Understanding (MOU) by which NSP agreed to pay $80,000 for the "creat[ion] and deliver[y] to NSP [of] a design and partial prototype of a computerized sales tool." Inventor Jerome Johnson executed the MOU on behalf of CWC. NSP Vice President Keith Wietecki, a utility industry veteran responsible for NSP's myriad rate programs and conservation programs, executed the MOU on behalf of the utility. According to Wietecki, the problems NSP was experiencing in helping customers select the most cost-effective rate program and conservation program from among the many in NSP's portfolio were the reasons for and the genesis of the EnergyWorks program—the same program that served as the basis for the '979 patent.

By January 1993, CWC's development of the EnergyWorks system had progressed to the point that it provided NSP in January 1993 with a "functional requirements document" specifying the EnergyWorks system in precise detail. A few days later, the parties executed a Software Use and General Services Agreement (Agreement), pursuant to which NSP agreed to pay $587,000 for CWC to build and deliver the EnergyWorks system. NSP Vice President Robert Schulte executed the Agreement for the utility.

## Applicable Law and Argument

A claimed invention is deemed to be "on sale" under 35 U.S.C. §102(b) if it is sold or offered for sale more than a year before the filing date of the patent application, *i.e.*, before the patent's "critical date." *Plumtree Software, Inc. v Datamize, LLC*, 473 F.3d 1152, 1160 (Fed. Cir. 2006). A patent is invalid due to an on-sale bar if two conditions are met: the invention is "the subject of a commercial offer for sale"; and the invention is "ready for patenting." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998). The MOU and Agreement meet both prongs of the test and constitute offers for sale and sales of the claimed invention before the critical date. Therefore, the '979 patent is invalid as a matter of law.

### A. The MOU and Agreement Were Commercial Offers for Sale of a System Containing Each Element of the Asserted Claims.

"A commercial offer is one which the other party could make into a binding contract by simple acceptance (assuming consideration)." *Plumtree*, 473 F.3d at 1162 (cites/quotes omitted). The June 1992 MOU was an offer for sale because it required NSP to pay CWC $80,000 to develop a working prototype containing all the elements of the subject claims. Indeed, the testimony of Wietecki and John Bartunek – a member of the NSP team on the EnergyWorks project – establishes that each element of the asserted claims was present in the system NSP paid CWC to develop under the MOU. Because the only step necessary to make the MOU a binding contract was to accept CWC's terms, the MOU was a commercial offer for sale. *Plumtree*, 473 F.3d at 1162; *see also Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1324 (Fed. Cir. 2002) (holding that an offer to create a prototype in exchange for full-time employment was an offer for sale).

The January 1993 Agreement was also an offer for sale because NSP promised to pay $587,000 in return for CWC's delivery of a system containing each element of the subject claims -- as independently established by Schulte's and Bartunek's deposition testimony. Because NSP could and did make CWC's offer into a binding contract by acceptance, the Agreement also

served as a commercial offer for sale.  *See Plumtree*, 473 F.3d at 1162.

### B. The Invention of the '979 Patent Was Ready for Patenting Before the MOU and Agreement Were Executed.

"Ready for patenting" means that the invention is either reduced to practice or "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Pfaff*, 525 U.S. at 67-68.  One can "prove that an invention is complete and ready for patenting before it has actually been reduced to practice."  *Id*. at 66.  Indeed, "the thrust of the on-sale inquiry is whether the inventor *thought* he had a product which could be and was offered to customers, not whether he could prevail under the technicalities of reduction to practice."  *Petrolite Corp. v. Baker Hughes, Inc*., 96 F.3d 1423, 1427 (Fed. Cir. 1996).

The MOU itself recites that CWC began working on the computer-assisted sales system in February 1992, four months before the MOU was executed.  Before executing the MOU on behalf of NSP, Wietecki was shown "mock-up screens" by CWC that represented what the system would look like, as well as how its functionality and output would be depicted on the computer.  CWC "expressed all the confidence in the world that they could do it" – create and deliver the computer-assisted sales system being sold in the MOU.

By the January 1993 execution of the Agreement, the computer-assisted sales system had been developed even further.  Only three days before the parties executed the Agreement, CWC had developed and provided to NSP a "functional requirements document" that described in detail the system to be delivered.  And both CWC and NSP were confident the system could be delivered.  According to Schulte, "We wouldn't have signed the contract if we didn't think they could do it."  As for whether CWC appeared similarly confident that it could deliver the system, "Oh, yeah, or they wouldn't have sold us."

CWC believed the EnergyWorks system was ready for patenting when it offered to build and deliver the system to NSP in the MOU and Agreement.  This confidence helped convince NSP to spend $80,000, then another $587,000, to purchase the system.  The two NSP executives who signed these agreements confirm that the system bought met every element of the claims-in-suit.  Therefore, the claims-in-suit were ready for patenting at the time of the 1992 MOU and 1993 Agreement, which serve as on-sale bars to those claims.

### Conclusion

The commercial offers for sale and sales of the EnergyWorks system that embodied the claims-in-suit invalidate the '979 patent as a matter of law.  Therefore, defendant GE asks the Court for leave to file a motion for summary judgment of invalidity of claims 1-2, 5-6, 9, 24-25, 27-28, and 32 of the '979 patent.

Respectfully,

*/s/ Johnny Ward/*

T. John Ward, Jr.

# APPENDIX

| Claim | Limitation | Representative evidence of pre-critical date sale and offer for sale |
|---|---|---|
| 1 | A computer implemented sales system for assisting with the sale of utility products and services by generating customized reports related to how the customer can optimize its costs for utility products and services, comprising: | Keith Wietecki tr. 150:11-153:23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 104:10-110:11. |
| | a receiver configured to receive data representative of customer utility usage, utility rates, and utility costs saving programs; | Keith Wietecki tr. 150:11-152:3; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 90:21-92:25. |
| | a memory arrangement coupled to the receiver and configured to store the data representing the customers utility usage, utility rates, and the utility costs saving programs; | Keith Wietecki tr. 150:11-152:3; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 90:21-92:25 |
| | a processor coupled to the memory arrangement and configured to: | Keith Wietecki tr. 150:11-153:23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 90:21-97:15, 97:7-21, 98:23-100:25, 100:4-18 |
| | process the data representing the customer utility usage, the utility rates, and the utility costs saving programs in order to select a utility service rate and a utility costs savings program for the customer; and | Keith Wietecki tr. 150:11-153:8; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 93:1-94:22 |
| | generate customized reports illustrating revised customer utility costs based on applying the customer utility usage to the data representative of the selected utility service rate, and the selected utility costs saving program. | Keith Wietecki tr. 153:9-23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 98:23-100:25 |
| 2 | processor configured to output reports on-line. | Robert Schulte tr. 108:1-110:11. |
| 5 | system receives, stores, and processes past usage data to provide historical perspective and costs. | Keith Wietecki tr. 150:11-153:23; Robert Schulte tr. 90:21-94:22. |
| 6 | system receives, stores, and | Robert Schulte tr. 106:8-107:25; |

|  | processes future usage data to provide prospective view of usage and costs. | John Bartunek tr. 55:8-56:3. |
|---|---|---|
| 9 | receives, stores, and processes data from on-line connection. | Robert Schulte tr. 108:1-110:11. |
| 24 | A computer system implemented method for facilitating sales of utility products and services by generating customized reports related to how the customer can optimize its costs for utility products and services, | Keith Wietecki tr. 150:11-153:23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 104:10-110:11. |
|  | the computer system including a memory arrangement and at least one processing unit coupled to the memory arrangement, the method comprising the steps of: | Keith Wietecki tr. 150:11-153:23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 90:21-97:15, 97:7-21, 98:23-100:25, 100:4-18. |
|  | receiving and storing in the memory arrangement data representing customer utility usage, utility rates, and utility costs saving programs; | Keith Wietecki tr. 150:11-152:3; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 90:21-92:25 |
|  | selecting a utility rate and a utility costs saving program for the customer in response to processing the data representing the customer utility usage, the utility rates and the utility costs saving program; and | Keith Wietecki tr. 150:11-153:8; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 93:1-94::22 |
|  | generating customized reports illustrating revised customer costs based on applying the customer utility usage to the data representative of the selected utility rate and the selected utility costs saving program. | Keith Wietecki tr. 153:9-23; John Bartunek tr. 49:2-51:11; Robert Schulte tr. 98:23-100:25 |
| 25 | outputting on-line the customized reports generated. | Robert Schulte tr. 108:1-110:11. |
| 27 | customized reports include graphs. | John Bartunek tr. 50:22-51:11, 54:11-55:1. |
| 28 | ability to receive, store and process past usage data to provide historical perspective and costs. | Keith Wietecki tr. 151:16-153:23; Robert Schulte tr. 90:21-94:22. |
| 32 | ability to receive, store and process data from on-line connection. | Robert Schulte tr. 108:1-110:11. |